UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

Viktor Novosel

    v.                                  Civil No. 10-cv-165-PB

William L. Wrenn et al.

## REPORT AND RECOMMENDATION

Before the Court is the motion for a preliminary injunction (doc. no. 9), filed pro se by Viktor Novosel, an inmate at the New Hampshire State Prison ("NHSP").  The motion is before the Court for proposed findings of fact and a recommendation as to its disposition.  See Order (Dec. 3, 2010) (referring motion for preliminary injunction to magistrate judge).  The motion is based on Novosel's claims, set forth in the complaint (doc. no. 1) that defendants, all supervisors in the prison system, have violated his rights under the First and Fourteenth Amendments by rejecting letters written to him in Croatian by his brother, Mijo; by not informing him that Mijo's letters were rejected, and; by not providing him an opportunity to appeal that rejection of mail.  Defendants, William Wrenn, Commissioner of

the New Hampshire Department of Corrections ("DOC"); DOC Capt. Chris Kench; New Hampshire State Prison ("NHSP") Warden Richard M. Gerry; and current and former NHSP mailroom supervisors Cpl. Rodney Knieriemen and Sgt. Stephen O'Rourke, filed their objection (doc. no. 13) to the motion for a preliminary injunction. Novosel filed a reply memorandum (doc. no. 19). The parties appeared before the Court for an evidentiary hearing on January 5, 2011, and testimony and exhibits were received into evidence. For reasons set forth more fully below, the Court recommends that the motion (doc. no. 9) be denied.

## Background

Novosel is a 75 year-old man who has been incarcerated at the NHSP for more than 35 years. For more than three decades, until late 2006, Novosel has exchanged letters written in both English and Croatian with friends and family living in the United States, Canada, and Croatia. Croatia is Novosel's native language. Novosel's older brother Mijo, a Canadian resident in his 80s, cannot write in English, but has a daughter who has written to Novosel in English on her father's behalf.

Novosel testified that, in June 2002, he received a notice from the prison which concerned a letter written to him in Croatian by Mijo.  Plaintiff's Exhibit 6 is a notice, received by Novosel on June 7, 2002, stating that the NHSP "Literary Review Committee" found a letter from Mijo to be in compliance with Policy and Procedure Directive ("PPD") 5.36.[1]

A.    Letters Returned in 2006

Novosel testified that the NHSP mailroom began returning to Mijo the letters that Mijo wrote in Croatian beginning in late 2006, without providing Novosel any notice regarding the letters' receipt or rejection.  Novosel produced a letter signed by Mijo, written in English by Mijo's daughter on her father's behalf, dated February 5, 2007, which states that the prison had returned to Mijo five letters that he had written to Novosel in Croatian.  See Pl.'s Ex. 2.

---

[1]PPD 5.36 is not part of the record in this case.  PPD 5.26 currently provides that a Literary Review Committee, comprised of representatives from the prison's departments of security, mental health, and education, shall have the duty to review incoming and outgoing mail to ensure compliance with inmate mail guidelines.

Novosel testified that he took a number of steps to determine why Mijo's five letters had been rejected.  Novosel called Mijo to find out why the letters were returned.  During the call, however, the brothers caught up on family news and did not talk about the rejected letters.

Novosel testified that he showed Mijo's February 5, 2007, letter to the "prison administration" to find out why the Croatian letters had been returned and was told that "they would see what they could do" about the missing mail.  While there is no documentary evidence relating to inquiries Novosel made in 2007, Defendants' Exhibit F is an inmate request slip Novosel directed to the prison mailroom, dated February 20, 2008, which complains that he had just received a letter from Mijo stating that the prison had returned mail to Mijo on a few occasions with no explanation.  Defs.' Ex. F.  The mailroom's reply, dated February 22, 2008, directed Novosel to ask his brother to examine the envelope, and included a reference to PPD 5.26, and stated that letters lacking an inmate identification number will be "returned as undeliverable due to improper address."  Defs.' Ex. F.

Novosel testified that he wrote to Mijo twice to ask why the prison had returned the letters. A Christmas card signed by Mijo and written in English by Mijo's daughter, dated December 23, 2008, states, "All my letters that I wrote to you have been returned because they were written in Croatian." Pl.'s Ex. 3.

Novosel testified that from late 2006 to August 2009, Novosel did not receive any mail from Mijo written in Croatian. Mijo occasionally asked his daughter to write in English on his behalf during that time frame, and it appears Novosel received those letters.

B. Mijo's 2009 Letters from Canada and Croatia

Novosel testified that his brother Mijo was in Croatia in 2009 to attend a funeral for their younger brother and sister. Novosel testified that Mijo, while still in Croatia, wrote a letter about the funeral to Novosel, and, receiving no response, wrote another letter to Novosel after returning to Canada. When Novosel still failed to respond, Mijo sent a letter to Novosel by certified mail, which included photos of the funeral and the gravesite. Novosel testified that he received the letter sent via certified mail.

Without producing the certified letter, which was written in Croatian, Novosel testified regarding its contents.  Novosel testified that the certified letter stated that the prison had returned two letters Mijo had recently written to Novosel regarding the deaths.  Novosel testified that, in the certified letter, Mijo asked why his letters from Canada and Croatia would have been returned, as Mijo believed that they contained nothing "political" affecting the state or prison.

Novosel testified that he also received an unsigned note in 2009, passed along by another inmate, stating that the prison had rejected letters from Mijo.  Novosel testified that he believes that a staff member in the mailroom drafted the note because inmates would not know if incoming mail had been returned.

Novosel testified that, after receiving the unsigned note and the August 2009 certified letter, he grieved the missing letters from Mijo and complained about the lack of notice and opportunity to appeal the rejection of those letters.  Novosel submitted an inmate request slip to the mailroom on August 30, 2009, stating that he had recently found out that letters from

his brother had been returned, and that he had not received notice or a chance to appeal before the letters were sent back. See Pl.'s Ex. 1.  The initial reply from the mailroom consisted of two questions for Novosel:  "What were [the letters] rejected for?" and "What was written on the envelopes?"  Id.  Novosel, dissatisfied with that reply, submitted a second request slip emphasizing that he was complaining about the lack of notice and opportunity to appeal.  The mailroom replied by stamping onto the slip the information stamped on mail lacking an inmate number as part of the address:  "Per PPD 5.26 all incoming and outgoing mail will have inmate # [sic] affixed to all correspondence.  Failure to comply with this directive will result in mail being returned as undeliverable due to improper address."  Pl.'s Ex. 1.  Novosel sent a grievance to the warden, specifically complaining about the mailroom's failure to notify him when it rejected Mijo's letters.  The warden replied that inmates do not receive notice of mail returned to sender.  Id. Capt. Kench's response to Novosel's appeal to Commissioner Wrenn, dated October 27, 2009, provided the same response.  Id.

C.   <u>Mailroom Procedures</u>

Cpl. Rodney Knieriemen, the mailroom supervisor since May 2007, testified regarding NHSP mail processing procedures. Knieriemen testified that four staff members work in the mailroom on weekdays, and three work there on Saturdays.  In a worst case scenario of absenteeism, there might be one or two regular employees absent.  Vacancies are staffed internally by a short list of NHSP personnel whose normal assignments may be elsewhere in the prison, who are chosen to "backfill" mailroom vacancies because they are familiar with PPD 5.26 and know how to follow the procedures outlined therein.

Knieriemen testified that each day, a mailroom staff member picks up the mail from the United States Post Office and signs for any certified mail that may be held there.  Knieriemen testified that after that point, all incoming mail, whether sent by certified or regular mail, is treated the same way.

When the incoming mail arrives at the prison mailroom, a staff member checks the envelope and the address to see if it is deliverable.  Knieriemen testified that to determine if a letter is deliverable, the mailroom staff member checks the computer

system to make sure that the inmate number and name in the address matches the inmate's booking name.  If the address on the envelope lacks an inmate number or bears a number that does not match the name, the letter is returned to sender as "undeliverable."  Knieriemen testified that the prison would deem mail "undeliverable" if it lacked a correct or legible inmate name, identification number, or mailing address.  If a letter is deemed undeliverable, the NHSP mailroom puts a "return to sender" stamp on the envelope and checks off a box on the stamp indicating "insufficient address."  If the reason for the return is the lack of an inmate number, the mailroom stamps the letter with a second stamp stating, "Per PPD 5.26 all incoming and outgoing mail will have inmate # [sic] affixed to all correspondence.  Failure to comply with this directive will result in mail being returned as undeliverable due to improper address."  Defs.' Ex. D.  The Court infers from Knieriemen's testimony that mail returned to sender is not logged in as rejected by the mailroom staff, as no notice or an opportunity to appeal is provided to the inmate regarding the prison's decision that mail is undeliverable.  Knieriemen testified that

the United States Postal Service picks up undeliverable mail each day and that the Postal Service returns it to sender or sends it to the dead letter office if it has no return address.

Knieriemen testified that properly addressed, "deliverable" mail is opened by mailroom staff and scanned for contraband, checks, or money orders.  When the mailroom rejects mail after opening it, typically because it contains contraband, the staff fills out a three-part form stating the reason for the rejection, and the prisoner and sender receive notice of the rejection of that letter.  PPD 5.26 states, in pertinent part: "Any incoming mail that contains items that are not authorized to be sent through the mail, cannot be checked for contraband without being destroyed or contains unauthorized items will be returned to the sender and logged in the mailroom."  The NHSP retains one copy of the form, one is sent to the prisoner, and one is returned to sender along with the entire letter that included the contraband.  Knieriemen testified that the NHSP policy is for the mailroom to keep its copy of the rejected mail form for 60 days, but presently, the mailroom is retaining that form for one year.

Knieriemen testified that prior to 2004, incoming inmate mail did not need to have an inmate number as part of the address.  In 2004, the NHSP began to require that incoming mail include an inmate number in the address, as the number of inmates in the system and the resulting volume of mail had increased.  Knieriemen testified that the inmate number requirement ensures that two inmates with similar names will not have their mail misdirected.

Knieriemen testified that in 2008, the NHSP changed each inmate's identification number to a unique, permanent identifier and notified inmates that their mail would need to include the new inmate number or would be marked undeliverable and returned to sender.  Knieriemen testified that the inmate identification number requirement has streamlined the prison's processing of mail.  While an inmate prior to 2008 could have had more than one number assigned to him, the 2008 number stays with the inmate as long as he remains in the system and will not change if he is released and later returns to prison.

Knieriemen testified that inmates have received notice about changes in the mail procedures, including the 2004 and

2008 inmate number requirements, through memoranda addressed to
all inmates and posted in common areas.  The May 2008 memorandum
regarding the new inmate numbers, Defs.' Ex. C, notifies inmates
that they must tell those who write to them to address mail
using the new inmate number, and that there would be a 30-day
grace period during which inmates would continue to receive mail
using the old number.  Knieriemen testified that the NHSP gave
inmates more than two months' notice before implementing the
policy of returning mail with old inmate identification numbers.

Knieriemen testified that the prison does not require
incoming mail to be written in English, so long as the address
on the envelope is complete and legible.  Knieriemen testified
that the mailroom policy of not rejecting letters based on the
language in which they are written has been the policy since
prior to Knieriemen becoming a mailroom supervisor in 2007.
Knieriemen testified that the mailroom is generally not
interested in the written content of incoming mail; the mailroom
staff inspects inside the envelope primarily to find contraband
or money orders.  The staff does not read letters unless tipped
off by law enforcement or another corrections department to

12

risks associated with particular prisoners.  The mailroom does not have the staff or time to read all letters that come to the prison.  Novosel corroborated the testimony about the absence of an English-only rule in testifying that other inmates regularly receive family letters written in languages including Arabic and Spanish.

In response to the Court's question regarding whether Novosel knew if the letters returned to Mijo contained Novosel's inmate identification number in the address, Novosel testified that he did not know.  Novosel testified that other letters that he has received from Mijo have been addressed with his inmate identification number, including the certified mail that Novosel received in August 2009.

Plaintiff's Exhibit 2 includes copies of two envelopes, received by Novosel in 2010, both bearing Mijo's return address. The first envelope, received on February 26, 2010, bears Novosel's outdated inmate identification number in the recipient's address, and the second, received March 15, 2010, includes Novosel's current number in the address.  Novosel explained that Mijo's daughter's handwriting is on the address

with the outdated number, and the letter inside that envelope was written in English by Mijo's daughter for her father.  Mijo himself wrote the address on the envelope with the current identification number, which Novosel received in March 2010.

Knieriemen testified that it was "odd" that Novosel had received a letter with an old inmate number in February 2010, as the mailroom staff "knows" everyone only by inmate number and not by name and housing unit.  Knieriemen speculated that the delivery of that letter in 2010 might have resulted from the intervention of a substitute in the mailroom, who might know Novosel by name and housing unit, who could have marked the envelope with the proper unit address without needing to look him up by inmate number in the prison computer system.  The Court infers from the evidence that the routine procedure involves checking the computer to look up the inmate's housing unit given the inmate number, and to mark the housing unit on the outside of the envelope.  Therefore, the procedure described by Knieriemen would have been irregular and contrary to protocol.

D.   Deliberate Interference with Mail

Novosel testified that he believes that the issues relating to his mail show that someone in the prison is deliberately interfering with his mail.  Novosel testified that it is possible for prison staff other than regular mailroom employees to have access to his mail, and that his ex-wife's relatives work in the prison system.  Novosel testified that, in the past, he sent a grievance to the warden regarding a container of food that he purchased from the canteen that was not sealed, and therein alerted the warden that someone in the prison may be persecuting him.

Knieriemen testified that he cannot watch all of the substitutes and regular mailroom staff all of the time, so that, he acknowledged, it would be possible for an NHSP employee to return mail addressed to Novosel based on the language in which it was written without Knieriemen's knowledge.  Knieriemen qualified his answer, however, in also testifying that mailroom substitutes are screened for their familiarity with and adherence to PPD 5.26, that Knieriemen has no knowledge of such misconduct having occurred in the mailroom, and that if anyone

15

were tampering with Novosel's mail, it would not be tolerated.
Knieriemen testified that "the person would be brought in" and
"the issue would be dealt with."

Discussion

I.   Preliminary Injunction Standard

In considering a motion for a preliminary injunction, a
district court must consider: "(1) the plaintiff's likelihood of
success on the merits; (2) the potential for irreparable harm in
the absence of an injunction; (3) whether issuing an injunction
will burden the defendants less than denying an injunction would
burden the plaintiffs; and (4) the effect, if any, on the public
interest."  Boston Duck Tours, LP v. Super Duck Tours, LLC, 531
F.3d 1, 11 (1st Cir. 2008) (quotation marks and citations
omitted).  "The first two factors are the most important and, in
most cases, 'irreparable harm constitutes a necessary threshold
showing for an award of preliminary injunctive relief.'"
González-Droz v. González-Colon, 573 F.3d 75, 79 (1st Cir. 2009)
(quoting Charlesbank Equity Fund II, LP v. Blinds To Go, Inc.,
370 F.3d 151, 162 (1st Cir. 2004)).  The burden of proof on a

16

motion for preliminary injunction is on the movant.  See

Esso Standard Oil Co. v. Monroig-Zayas, 445 F.3d 13, 18 (1st

Cir. 2006).

II.  Claims

Novosel presented evidence relating to two claims in

support of his motion for a preliminary injunction: (1)

defendants violated his First Amendment right to correspond with

his family, in that a prison employee returned Croatian letters

to Mijo in 2006 and 2009, and the defendant supervisors are

liable for the letters' rejection; and (2) defendants violated

Novosel's Fourteenth Amendment right when they provided him with

no prior notice or opportunity to appeal the rejection of those

letters in 2006 and 2009.  The following discussion demonstrates

that Novosel's motion for a preliminary injunction should be

denied, because he has shown neither a likelihood of success on

the merits as to the claims underlying the motion for a

preliminary injunction, nor irreparable harm in the absence of

an injunction.

III. <u>First Amendment Claims</u>

    A.   <u>Interference with Mail Due to Deliberate Misconduct</u>

   "[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." <u>Pell v. Procunier</u>, 417 U.S. 817, 822 (1974).  Prison inmates maintain a First Amendment right, albeit not an unlimited right, to receive mail.  See <u>Jones v. N.C. Prisoners' Labor Union, Inc.</u>, 433 U.S. 119, 129 (1977); <u>see also</u> <u>Thornburgh v. Abbott</u>, 490 U.S. 401, 407 (1989); <u>Ortiz v. Fort Dodge Corr. Facility</u>, 368 F.3d 1024, 1026 (8th Cir. 2004) (prisoners have right to send and receive mail subject to prison officials' legitimate interest in monitoring mail for security reasons).

   Novosel characterized his First Amendment claim, during the preliminary injunction hearing, as asserting that an employee biased against him, related to his ex-wife, deliberately interfered with his mail by wrongfully returning Mijo's Croatian letters.  Novosel did not identify any particular employee in his assertion of misconduct, beyond testifying that a number of prison employees are related to his ex-wife.  The evidence does

18

not show, however, that any such relative served in the mailroom
or otherwise had access to incoming mail from Mijo.  Rather,
Novosel offered only his own beliefs in this regard, without
supporting those beliefs with specific facts.  Such conclusory
testimony is not entitled to substantial weight.

Moreover, the Court does not find that such misconduct was
likely to have occurred.  While Knieriemen candidly acknowledged
that he could not watch all of the staff and substitutes all of
the time, and that a biased employee working in the mailroom
could have surreptitiously returned a Croatian letter, he
further testified that mailroom substitutes are screened for
their adherence to PPD 5.26, and that there are other policy-
based reasons why mail could have been returned without notice,
including, for example, the lack of a current inmate number or
unclear address on the envelope.  Cf. Quinones v. Houser Buick,
436 F.3d 284, 291 (1st Cir. 2006) (employee failed to raise
triable issue of fact sufficient to defeat motion for summary
judgment in offering only his unsupported characterizations and
beliefs that national origin discrimination resulted in his
receiving lower pay, where nondiscriminatory reasons were

equally plausible).  As explained more fully below, the evidence failed to show that misconduct led to the letters' return, as conduct consistent with prison policies was at least equally likely to have been the reason why the letters were rejected.

As proof that a biased employee returned letters written in Croatian, Novosel cited Mijo's opinion, expressed in letters delivered to Novosel in 2007 and 2008, that the previous letters were returned because they were written in Croatian.[2]  See Pl.'s Ex. 1.  The evidence shows that Mijo sent letters written in

---

[2]The Court will consider Novosel's testimony on this point over defendants' hearsay objection.  The First Circuit has observed that "hearsay materials are often received in preliminary injunction proceedings.  The dispositive question is not their classification as hearsay but whether, weighing all the attendant factors, including the need for expedition, this type of evidence was appropriate given the character and objectives of the injunctive proceeding."  Asseo v. Pan Am. Grain Co., 805 F.2d 23, 26 (1st Cir. 1986).  The hearsay nature of the testimony is thus a factor bearing on the weight, not the admissibility, of the evidence at issue for the purposes of considering the motion for a preliminary injunction.  Mullins v. City of New York, 626 F.3d 47, 52 (2d Cir. 2010).  The preliminary injunction hearing presented sufficient bases for considering Mijo's hearsay statements as evidence of the truth of the matters asserted, including the summary nature of the hearing, the expedited nature of the relief requested, and the problems that confronted this pro se prisoner seeking to prove that the prison returned letters to an elderly brother living in Canada, without notifying Novosel first.

Croatian to Novosel which the prison returned to Mijo in 2006
and 2009.  Novosel has not carried his burden of showing,
however, that the prison returned the letters wrongfully.
Knieriemen testified credibly that the mailroom staff does not
have an English-only policy, and further testified that due to
the volume of incoming mail, the staff would lack the ability to
apply an English-only policy systematically to any prisoner.
While Mijo's handwriting outside an envelope might alert an
employee familiar with Novosel's background that the letter
inside could be written in Croatian, at least two letters
addressed personally by Mijo and written in Croatian were
delivered to Novosel during the relevant time period.  That
evidence suggests that mail is not systematically denied to
Novosel because it is written in Croatian.

     Novosel has cited Mijo's belief that the letters were
returned because they were written in Croatian, and his own
belief that members of the prison staff were personally biased
against him, as evidence of the reason for the letters' return.
The Court finds that the evidence weighs against such a finding.
The Court further finds that Novosel has failed to meet his

burden to demonstrate that the letters were returned due to any intentional misconduct on the part of prison employees.

### B.   Inmate Number Requirement

The evidence suggests an alternative reason Mijo's 2009 letters may have been returned: the lack of a current inmate identification number.  PPD 5.26 states that letters lacking a current inmate identification number will be returned to sender as undeliverable.  The evidence presented at the hearing was that mail returned to sender would be stamped as undeliverable due to the lack of an inmate number, without any notice being provided to the inmate.  While there is no evidence in the record on the appearance of the envelopes returned to Mijo, each time Novosel grieved missing mail, the prison cited PPD 5.26 as a reason for the return to have occurred.

### C.   Supervisory Liability Regarding Biased Employee

Furthermore, based on the evidence relating to the motion for a preliminary injunction, Novosel is not likely to prevail on his constitutional claims as to the defendant supervisors. There is no supervisory liability in an action such as this,

asserting that a supervisor is liable per se for the federal constitutional violations of his or her subordinates.  See Ashcroft, ___ U.S. at ___, 129 S. Ct. at 1949.  "[S]upervisory liability lies only where an affirmative link between the behavior of a subordinate and the action or inaction of his supervisor exists such that the supervisor's conduct led inexorably to the constitutional violation."  Maldonado v. Fontanes, 568 F.3d 263, 275 (1st Cir. 2009) (internal quotation marks and citation omitted).  A supervisor is not deliberately indifferent if he or she is alleged merely to have been present for, or otherwise obtains knowledge of, the wrongdoing of a subordinate, or if the supervisor promulgated a policy that does not, on its face, direct or condone the wrongful conduct of subordinates.  Id.

Here, the evidence fails to show that any supervisory prison official was aware of a substantial risk that a biased inmate interfered with Novosel's mail, or that there is any policy that directs or condones wrongful conduct.  Novosel did not grieve the returned letters on the basis of a suspected bias, and there is no other evidence suggesting that any

supervisor neglected any duty owed to Novosel with respect to incoming mail.  Accordingly, the Court concludes that Novosel has failed to show a likelihood of prevailing on the merits of his First Amendment claim against the supervisory defendants.

    D.   <u>Likelihood of Success on Merits</u>

Presuming that Mijo's letters were returned due to the lack of an accurate, current inmate number, the Court next considers whether Novosel has carried his burden of showing a likelihood of success in proving that the inmate number policy is not reasonably related to a legitimate penological interest.  <u>See</u> <u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987).  A court, in evaluating whether or not a particular prison regulation is constitutional, considers four factors: (1) whether the regulation has a "valid, rational connection" to a legitimate, neutral penological objective, (2) "whether alternative means are open to inmates to exercise the asserted right," (3) "what impact an accommodation of the right would have on guards and inmates and prison resources," and (4) "whether there are 'ready alternatives' to the regulation."  <u>Overton v. Bazzetta</u>, 539 U.S. 126, 132 (2003) (citing <u>Turner</u>, 482 U.S. at 89-91).  In applying

these factors, this Court must accord prison administrators significant deference in defining legitimate goals for the corrections system, and for determining the best means of accomplishing those goals.  See Overton, 539 U.S. at 132; Pell, 417 U.S. at 826-27.  The burden is on the prisoner to disprove the validity of prison policies.  See Overton, 539 U.S. at 132.

The inmate number requirement for incoming mail is rationally related to the content-neutral goals of streamlining inmate mail processing and ensuring proper mail delivery.  Mail misdelivery is more likely to result from a process directing mail based only on the inmate's name, as several inmates might have similar names.  Misdeliveries could affect prison safety and security, as, for example, personal information intended for one inmate becomes known to another.  See Farlin v. Lewis, 962 F.2d 13, *2 (unpublished table decision), 1992 WL 98710 (9th Cir. 1992).  The risk of such misdelivery is lower when a unique, numeric identifier and the name are cross-checked to ensure that mail will be sent to the right inmate.

With respect to the second Turner factor, to the extent the inmate number requirement interferes with an inmate's receipt of

incoming mail, inmates have alternative ways to correspond with their friends and family.  The policy at issue does not affect any other form of social interaction, including phone calls and visits, which could be a conduit for prisoners to tell family members about their current address information.  Inmates can also send and receive mail that bears the proper identification number.  The prison does not discard a letter with an inaccurate or absent number; the letter is marked undeliverable and stamped with the inmate number requirement and a reference to PPD 5.26. The United States Postal Service picks up those undeliverable letters and returns them to the sender, according to its own procedures.  The sender upon receiving returned mail marked with a stamped reason for the rejection can correct the error and resend the letter.

As to the impact that an accommodation in Novosel's case would have on guards, other inmates, and prison resources, Knieriemen testified that the mailroom has limited resources. Requiring senders to include the inmate's current number saves resources, reduces errors, and streamlines the prison mail delivery process.  Modifying the system to continue to deliver

mail lacking a current inmate number would slow the process and increase the administrative burden on the mailroom by requiring the staff to process certain letters separately to see if the inmate's name or old number would uniquely identify an inmate at NHSP.  That extra step would reduce the resources available to screen deliverable mail for contraband, delay the delivery of mail for other inmates, and increase the risk of misdelivery of incoming mail.

As to the fourth Turner factor regarding whether there are ready alternatives to the policy at issue that would avoid burdening the inmate's rights, the evidence suggests one possibility, but does not show that it is cost-free, namely, extending the grace period for a limited period of time to permit the delivery of mail bearing old inmate numbers to inmates whose names are unique.  While the Court infers from Knieriemen's testimony that the prison computer system does not readily accommodate using old numbers to look up current inmates, the Court cannot discount the possibility that mailroom staff could look up an inmate's name to find a current inmate

number and could use that information to find out where an inmate with a unique name is housed.[3]

The Ninth Circuit, in an unpublished decision, considering a similar inmate number address requirement in the Arizona prison system, found that modifying the prison's mail policy to require the delivery of mail addressed to any inmate with a unique name would impose only de minimis costs upon the prison. See Farlin v. Lewis, 1992 WL 98710 at *2.  Here, however, the facts are different:  Novosel has not carried his burden of showing that modifying the inmate number policy to extend the grace period for him would be essentially cost free.  Factors including the mailroom's limited staff, budget cutbacks, and the volume of mail handled by the mailroom, do not lend themselves to finding on the record before the Court that such a modification would impose only de minimis costs, although the question is a close one.  On balance, however, upon properly

---

[3]The State provides a listing of inmate identification numbers indexed by inmate name on the State's website, at http://www4.egov.nh.gov/inmate locator/.  See generally Gent v. CUNA Mut. Ins. Soc'y, 611 F.3d 79, 84 n.5 (1st Cir. 2010) (court may take judicial notice of facts stated in official government website that are not reasonably in dispute (citing Denius v. Dunlap, 330 F.3d 919, 926-27 (7th Cir.2003)).

allocating the burden of proof to Novosel, the Court concludes
that Novosel has failed to show a likelihood of success on the
merits of his claim alleging that the NHSP policy of returning
to the sender letters lacking a current inmate number
constitutes an unconstitutional infringement of his First
Amendment rights.[4]

     E.    Irreparable Harm

The evidence does not show that Novosel is likely to suffer
irreparable harm in the absence of an injunction.  Novosel
received letters in August 2009 and March 2010 in Mijo's
handwriting, which included Novosel's current inmate number.
Mijo is apparently aware that his letters must include a current
inmate number, and he has recently demonstrated a capacity to
send Novosel letters with the correct address.  Novosel's niece
(Mijo's daughter) in February 2010, sent a letter to Novosel
with the old inmate number, but Novosel has not claimed that he

---

[4]Given my finding that Novosel has not demonstrated a
likelihood of success on the merits without reference to any
statute of limitations issues, the Court need not address
defendants' argument asserting a time bar to Novosel's claims
relating to letters returned in 2006.

has ever been denied access to letters addressed by his niece.
Accordingly, the Court finds that Novosel has failed to show
that he is likely to suffer irreparable harm in the absence of
an injunction directing that letters from Mijo be delivered even
if they do not include the current inmate number.  See González-
Droz, 573 F.3d at 79 (quoting Charlesbank Equity Fund II, 370
F.3d at 162 ("[I]n most cases, 'irreparable harm constitutes a
necessary threshold showing for an award of preliminary
injunctive relief.'")).  Accordingly, the motion for a
preliminary injunction should be denied, to the extent that it
is based on a First Amendment challenge to the prison policy
requiring incoming mail to include a current inmate number in
the address.

IV.  Due Process

   A.  Likelihood of Success on the Merits

   Novosel has contended in his motion for a preliminary
injunction (doc. no. 9) that the prison's failure to provide him
with prior notice of and an opportunity to appeal the letters'
rejection violated his due process rights.  The Fourteenth
Amendment provides that states shall not "deprive any person of

life, liberty, or property, without due process of law."  U.S.
Const. amend. XIV, § 1.

A court evaluating a due process claim must first determine
whether the plaintiff has been deprived of a constitutionally
protected interest in life, liberty, or property.  See Pérez-
Acevedo v. Rivero-Cubano, 520 F.3d 26, 30 (1st Cir. 2008) ("The
test for a procedural due process violation requires the
plaintiffs to show first, a deprivation of a protected . . .
interest, and second, a denial of due process.").

> In Procunier v. Martinez, the Supreme Court held
> "[t]he interest of prisoners and their correspondents
> in uncensored communication by letter, grounded as it
> is in the First Amendment, is plainly a 'liberty'
> interest within the meaning of the Fourteenth
> Amendment even though qualified of necessity by the
> circumstance of imprisonment."

Bonner v. Outlaw, 552 F.3d 673, 676 (8th Cir. 2009) (quoting
Procunier v. Martinez, 416 U.S. 396, 418 (1974), overruled on
other grounds by Thornburgh, 490 U.S. at 413-14).  Here, the
prison's failure to deliver certain letters to Novosel
implicated his liberty interest in receiving incoming First
Class mail, triggering in this case an inquiry into whether the

procedures employed by the prison in returning the letters to
Mijo were adequate.  See Bonner, 552 F.3d at 678.

    "In procedural due process claims, the deprivation by state
action of a constitutionally protected interest . . . is not in
itself unconstitutional; what is unconstitutional is the
deprivation of such an interest *without due process of
law*. . . . Therefore, to determine whether a constitutional
violation has occurred, it is necessary to ask what process the
State provided, and whether it was constitutionally adequate."
Zinermon v. Burch, 494 U.S. 113, 125-26 (1990) (citations
omitted, emphasis in original).

    Here, Novosel received no notice from the prison that the
letters had been returned until after he had initiated the
grievance process.  The prison's returning the letters alerted
Mijo that Novosel had not received the mail, and Mijo, in turn,
told Novosel.  Without specifically knowing why the NHSP deemed
the letters undeliverable, Novosel filed inquiries, a grievance,
and an appeal regarding the mailroom's handling of his incoming
mail.  In substantively responding to Novosel, prison officials
cited PPD 5.26 and quoted the section of the rule regarding the

inmate number requirement to explain why the letters had been returned.

The Supreme Court has held that minimal procedural protections must be provided when a prisoner's mail is not delivered, but the Court has not held that those minimal procedural protections must include prior notice. See Sikorski v. Whorton, 631 F. Supp. 2d 1327, 1350 n.17 (D. Nev. 2009) (citing Procunier, 416 U.S. at 418).  Notice after the fact can be sufficient; courts have upheld prison policies of returning unopened letters to the sender without notice to the prisoner, where the prison notified the sender regarding the reason for the letters' return, the sender repackaged the letter in conformity with prison regulations, and the prisoner received notice after the fact regarding the letters' return.  See, e.g., Sikorski, 631 F. Supp. 2d at 1348 (upholding prison policy of returning letters, unopened, without notice to prisoner, if sender put adhesive tape onto envelope); Jeffries v. Snake Riv. Corrs. – Or., Civ. No. 05-1851-JO, 2008 WL 3200802, *5 (D. Or. Aug. 4, 2008) (prison's failure to provide detailed notice to prisoners when returning mail unopened to sender because of

33

"noticeable violations" of incoming mail policies did not violate First Amendment); cf. Lena v. DuBois, 19 F.3d 1427 (unpublished table decision), 1994 WL 99940, *1 (1st Cir. Mar. 23, 1994) (per curiam) (prison's failure to provide prompt, written notice of return of book was of no consequence, as prisoner eventually received notice and could appeal to superintendent after book had been returned).

Here, there was evidence pointing to at least two possible explanations for why Novosel received no notice of the letters' return:  (1) the letters were undeliverable as addressed, and were returned unopened pursuant to PPD 5.26, and marked accordingly; or (2) a prison employee returned the letters contrary to policy and provided no notice to Novosel.  If the letters were returned unopened pursuant to PPD 5.26, the circumstances here would be similar to those in Sikorski, and the Court would follow its result for the following reasons.

### 1.   *Turner* Analysis of PPD 5.26

The Turner test applies in evaluating whether the policy directing the return of unopened mail without prior notice and an opportunity to appeal is reasonably related to a legitimate,

34

penological purpose.  See Avery v. Powell, 806 F. Supp. 7, 12
(D.N.H. 1992) (Turner applies to due process challenges to
prison regulations concerning incoming mail); see also Sikorski,
631 F. Supp. 2d at 1348 (applying Turner test in evaluating due
process challenge to prison's unopened mail policy).

The policy of returning unopened, noncompliant incoming
mail to the sender without prior notice or an opportunity to
appeal is rationally related to the content neutral goal of
conserving scarce resources, which in turn bears on prison
security.  Specifically, documenting the rejection of mail on
the triplicate form used by the prison every time a letter is
returned unopened due to an improper address would drain
resources away from the security task of examining deliverable
mail for contraband.  See Sikorski, 631 F. Supp. 2d at 1348.

As to the second Turner factor, regarding whether
alternative means are open to the prisoner to exercise the right
at issue (namely, notice and an opportunity to be heard at a
meaningful time and in a meaningful manner), the lack of prior
notice to the prisoner regarding a specific returned letter does
not mean that the prisoner receives no meaningful opportunity to

challenge the letter's return.  The policy at issue is not akin
to the prison simply discarding undeliverable letters; rather,
it resembles the United States Postal Service's practice of
returning to sender those letters lacking a sufficient address.
PPD 5.26(H) states that mail received without an identification
number will be returned to sender as having an insufficient
address.  Prisoners including Novosel received notice in 2004
and 2008 that it was their responsibility to notify family and
friends that mail include the correct inmate number, to ensure
efficient processing of mail.  Mijo's letters, returned to
sender, were necessarily marked by the NHSP in a manner
indicating to the United States Postal Service that they were
undeliverable.  Lacking evidence to the contrary regarding the
appearance of the envelopes returned to Mijo, the Court
concludes that the returned letters, if sent back as
undeliverable due to noncompliance with PPD 5.26, would have
also included a stamped notice telling Mijo to include an inmate
number in the address.  A sender like Mijo would have reason to
know the correct inmate number; Mijo demonstrated that he had
knowledge of the correct number when he sent a letter to Novosel

by certified mail in 2009 and a letter by regular mail in March 2010.  Upon receiving a returned letter stamped undeliverable due to the lack of an inmate number, the sender could look up the number, repackage the letter, and resend it, causing nothing more than a delay in delivery, rather than a complete deprivation of the right to receive mail.  The sender might also notify the prisoner via mail regarding the letter's initial rejection, as Mijo did for Novosel.

Here, the policy of not providing prior notice to Novosel did not render him unable to challenge the return of the letters.  The mailroom staff, the warden, and the commissioner's office responded to Novosel's inquiries about the letters' return by citing a prison policy that letters deemed undeliverable, lacking a proper inmate identification number, would be returned to sender without prior notice.  Novosel thus received postdeprivation notice of the reason for the letters' return, as well as a meaningful opportunity to challenge the cited reason for the letters' return.  See Lena, 1994 WL 99940, at *1 (prison's failure to provide prompt, written notice of return of book was of no consequence, as prisoner eventually

received notice and had opportunity to appeal reason for book's
return); see also Sikorski, 631 F. Supp. 2d at 1350 n.17
(inmate's procedural due process rights were not violated when
inmate could appeal mail returned to sender, and sender could
resend mail if inmate had prevailed upon appeal (citing McGann
v. Stock, 884 F.2d 582 (9th Cir. 1989) (unpublished table
decision)).

As to the third and fourth Turner factors, the record
before me, like that in Sikorski, indicates that providing the
prisoner prior notice and an opportunity to contest the return
of mail unopened to the sender would place a "significant burden
on prison resources." Sikorski, 631 F. Supp. 2d at 1349. While
the record does not permit the Court to quantify that burden, it
does not appear de minimis. Novosel has not proposed any
alternative to the current policy, apart from proposing that the
mailroom retain undeliverable mail, contact the prisoner, and
give the prisoner a chance to challenge the decision not to
deliver the mail. The record does not show that Novosel's
proposal would be essentially cost free. Therefore, the Court
concludes that Novosel has failed to show that the prison policy

at issue is not reasonably related to a legitimate penological
purpose.

### 2.   Deliberate Wrongdoing

Novosel's contention that letters were returned by a
vindictive, biased employee, acting without his or her
supervisor's knowledge, even if the Court were to find those
assertions proven, would not justify granting his motion for a
preliminary injunction on the due process claim.  The prison is
not required to provide any predeprivation procedures where:
(1) the loss resulted from an employee's intentional misconduct;
(2) state law offers a post-deprivation procedure or cause of
action to redress the injury caused by the misconduct; and (3)
predeprivation procedures would not reduce the risk of loss.
See Hudson v. Palmer, 468 U.S. 517, 534-35 (1984) (state not
liable for due process violation where prison guard
intentionally destroyed prisoner's property, in pursuing
personal vendetta against prisoner); see also Zinermon, 494 U.S.
at 132 (Hudson rule applies in cases involving deprivations of
liberty where state is unable to anticipate or prevent an
intentional tortfeasor's misconduct).

Here, the state law tort of intentional infliction of emotional distress could provide Novosel with a cause of action for damages to redress an employee's intentional misconduct in returning Mijo's mail, if Novosel could show that he has suffered severe emotional injury, and that the tortfeasor's conduct was intentional or reckless, extreme, and outrageous. See Mikell v. Sch. Admin. Unit No. 33, 158 N.H. 723, 729, 972 A.2d 1050, 1055 (2009) (evidence of defendant's position of authority over plaintiff may be relevant in showing outrageous nature of defendant's abuse of plaintiff (citing Restatement (Second) of Torts § 46 cmt. e at 74 (1965)).  Given the nature of the misconduct alleged, a vindictive act undertaken by a biased employee unbeknownst to his or her supervisors, predeprivation procedures would not reduce the risk of letters being returned without notice as a result of that misconduct.

Therefore, the Court concludes that Novosel cannot show a likelihood of prevailing on the merits of his Fourteenth Amendment claim.  As Novosel has failed to show a likelihood of prevailing on the merits, Novosel's motion for a preliminary injunction (doc. no. 9) should be denied.

40

B.   <u>Irreparable Harm</u>

While further discussion of the preliminary injunction factors is not necessary, the Court notes that the record would not support a finding of irreparable harm in the absence of an injunction.  The evidence relating to the probability of irreparable harm includes Mijo's advanced age, which increases the risk that the prison's returning Mijo's letters could lead to a permanent, premature loss of contact between the brothers, and the risk that the sender could not notify Novosel or resend any letter to Novosel in the future, due to the lack of prior notice from the prison.

The record does not demonstrate, however, that the risk of such a loss of contact or lack of notice after the fact is probable at this time in the absence of an injunction.  Novosel has continued to receive letters from Mijo since 2006, written in English by Mijo's daughter on her father's behalf, and, in August 2009, written in Croatian in Mijo's own hand.  Letters from Mijo notified Novosel that the prison sent back certain letters.  There is no evidence that any letters have been sent or returned since August 2009.  Thus, the evidence does not show

that an injunction is necessary to ensure that Novosel receives notice when letters from Mijo are returned.  Accordingly, the Court finds that Novosel has not made the requisite showing of irreparable harm in the absence of an injunction, to warrant the extraordinary remedy of granting a motion for a preliminary injunction.

## Conclusion

For reasons set forth more fully above, the Court proposes that the District Judge enter findings consistent with this report, and the Court recommends that the motion for a preliminary injunction (doc. no. 9) be denied.  Any objections to this Report and Recommendation must be filed within fourteen (14) days of receipt of this notice.  See 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2).  Failure to file objections within the specified time waives the right to appeal the district court's order.  See Sch. Union No. 37 v. United Nat'l Ins. Co., 617 F.3d

554, 564 (1st Cir. 2010); <u>United States v. Lugo Guerrero</u>, 524
F.3d 5, 14 (1st Cir. 2008).

_____
Landya B. McCafferty
United States Magistrate Judge

Date:  February 16, 2011

cc:  Viktor Novosel, pro se
     Kristen A. Fiore, Esq.
     Matthew G. Mavrogeorge, Esq.

LBM:nmd